919 So.2d 1252 (2005)
Juan David RODRIGUEZ, Appellant,
v.
STATE of Florida, Appellee.
Juan David Rodriguez, Petitioner,
v.
James V. Crosby, Jr., etc., Respondent.
Nos. SC00-99, SC01-2864.
Supreme Court of Florida.
May 26, 2005.
As Revised on Denial of Rehearing January 19, 2006.
*1259 Neal A. Dupree, Capital Collateral Regional Counsel  South, Rachel L. Day and Lucrecia R. Diaz, Assistants CCRC-South, Fort Lauderdale, FL, and Patricia A. Hogan, North Miami, FL, for Appellant/Petitioner.
Charles J. Crist, Jr., Attorney General, Tallahassee, FL, Lisa A. Rodriguez and Sandra S. Jaggard, Assistant Attorneys General, Miami, FL, for Appellee/Respondent.
PER CURIAM.
Juan David Rodriguez, a prisoner under sentence of death, appeals the denial of his postconviction motion filed pursuant to Florida Rule of Criminal Procedure 3.850. Rodriguez also petitions this Court for a writ of habeas corpus. We have jurisdiction. See Art. V, § 3(b)(1), (9), Fla. Const. For the reasons explained below, we affirm the trial court's denial of postconviction relief and deny habeas relief.

FACTUAL AND PROCEDURAL BACKGROUND
Rodriguez was charged and convicted of first-degree murder, armed robbery, conspiracy to commit a felony, attempted armed robbery, armed burglary with an assault, aggravated assault, and attempted first-degree murder. The charges arose from a shooting that occurred on May 13, 1988, at a shopping center and an attempted home invasion robbery that occurred the following day. The facts of this case are fully discussed in this Court's opinion on direct appeal. See Rodriguez v. State, 609 So.2d 493, 495-97 (Fla.1992). We briefly summarize them here for purposes of the claims raised in this proceeding.
In an effort to discharge a debt that he owed, Rodriguez led Ramon Fernandez and Carlos "Tata" Sponsa to an auto parts store located at a shopping center. Rodriguez accosted the victim Abelardo Saladrigas, the owner of the store, in the parking lot of the shopping center. Rodriguez chased the victim around the lot, shot him four times, and took his watch and a briefcase containing cash and a revolver. Id. at 495-96. Saladrigas later died at the hospital. Rodriguez fled the scene with Fernandez and Tata in a blue Mazda. Several people witnessed the crime.
The next day, Rodriguez, Fernandez, Tata, and several other men went to a residence intending to stage a home invasion robbery. While en route to the residence, Rodriguez purportedly told one of the men, Sergio Valdez, that he "had done a job" at an auto parts store the previous day. The home invasion was foiled when the resident produced a gun and began firing. As the men fled, Fernandez *1260 dropped the revolver that had been stolen from the murder victim the previous day.
Three weeks after the attempted home invasion, Fernandez was arrested. He confessed his involvement in the crimes and informed the police of Rodriguez's role in the shooting at the auto parts store. Ultimately, Rodriguez was arrested and charged with first-degree murder and the other offenses arising from these events.
Rodriguez was found guilty of all charges, and a unanimous jury recommended that Rodriguez be sentenced to death for the murder of Saladrigas. The trial court followed the recommendation, and found three aggravating factors: a prior conviction of violent felony; the murder was committed during a robbery and for financial gain; and the murder was especially heinous, atrocious, or cruel (HAC). In addition, the trial court found that Rodriguez's good marriage and family life constituted one nonstatutory mitigating factor.
On direct appeal, Rodriguez raised multiple claims relating to both the guilt and penalty phases of his trial.[1] This Court did not find a reversible error on any of Rodriguez's claims and affirmed both his convictions and sentences, including the death sentence. Id. at 501.
In September 1994, Rodriguez filed his first motion for postconviction relief pursuant to Florida Rule of Criminal Procedure 3.850. He filed amended motions in October 1995, April 1997, and July 1997. Rodriguez based each amendment on compliance with his public records requests. At a Huff[2] hearing, the defense attempted to file a fourth amended motion, but the trial court refused to recognize this amendment and proceeded on the claims raised in the third amended motion. After argument, the trial court ruled that an evidentiary hearing would be conducted on two claims of the thirty raised in Rodriguez's motion.[3] *1261 The trial court granted an evidentiary hearing on claims three and eight, regarding the adequacy of Rodriguez's mental health evaluation and counsel's investigation of possible mitigating evidence.
At the evidentiary hearing, the trial court heard testimony from Rodriguez's trial counsel, the mental health expert who evaluated Rodriguez for trial, and the mental health expert who evaluated Rodriguez for his postconviction claims. After the hearing, the trial court found no merit to Rodriguez's mental health, mitigation, and other claims, and denied postconviction relief.
Upon appeal to this Court, Rodriguez raised twelve issues, including numerous subissues. We concluded that Rodriguez's allegation relating to the preparation of his sentencing order, which Rodriguez had attempted to raise in the fourth amended motion, warranted an evidentiary hearing. Thus, we temporarily relinquished jurisdiction for the trial court to conduct an evidentiary hearing on this issue and to make additional findings and conclusions. The trial court denied Rodriguez relief on the sentencing order claim and he appealed to this Court. During the pendency of his appeal, Rodriguez also moved for this Court to relinquish jurisdiction to the trial court so that he may file a motion under Florida Rule of Criminal Procedure 3.203 for a determination of mental retardation.[4] We have issued an order denying the motion, but without prejudice to Rodriguez's *1262 right to file a rule 3.203 motion upon disposition of his postconviction appeal. See Rodriguez v. State, No. SC00-99, 919 So.2d 1252, 2005 WL 1243475 (Fla. order filed May 26, 2005).
In a petition for writ of habeas corpus filed as an original pleading in this Court, Rodriguez raises several claims of ineffective assistance of appellate counsel. He also questions this Court's harmless error analysis on direct appeal and asks this Court to revisit the constitutionality of his indictment in light of the subsequent decisions in Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).

RULE 3.850 MOTION ON APPEAL
On appeal, Rodriguez raises twelve distinct issues and several subissues regarding the trial court's original denial of postconviction relief. Rodriguez contends that (1) the trial court erred in denying a new penalty phase where the evidentiary hearing showed that trial counsel failed to investigate and present mental health mitigation and the mental health expert rendered inadequate mental health assistance; (2) the trial court erred in allowing the State to prepare the sentencing order; (3) the trial court erred in summarily denying his claims of a Brady[5] violation based on the State's failure to disclose information concerning Tata, an Ake[6] violation based on failure to provide him with an adequate mental health evaluation, and ineffective assistance of trial counsel based on counsel's failure to investigate or prepare for trial, to request a severance of offenses, and to object to various other errors at trial; (4) Rodriguez was denied effective assistance of counsel due to the failure of various agencies to comply with his public records requests; (5) the trial judge displayed judicial bias at trial and during the postconviction proceedings; (6) trial counsel was ineffective in failing to object to jury instructions regarding the aggravating circumstances, burden shifting, the jury's responsibility for sentencing, and an automatic aggravating circumstance; (7) prosecutorial misconduct occurred during the closing argument; (8) the Florida death penalty statute is unconstitutional; (9) an incomplete record on direct appeal led to ineffective assistance of counsel; (10) the Rule Regulating the Florida Bar 4-3.5(d)(4) prohibition on communication with jurors restricts Rodriguez's access to the courts; (11) impermissible victim impact was considered in Rodriguez's sentencing; and (12) Rodriguez did not receive a fundamentally fair trial because of cumulative error.
Rodriguez raises three additional claims relating to the proceedings during the relinquishment of jurisdiction. He asserts that (13) the trial judge should have disqualified himself from presiding over Rodriguez's original postconviction proceedings; (14) he was not afforded a full and fair hearing on the sentencing order issue during relinquishment of jurisdiction; and (15) the trial court erred in denying him relief on the merits of the sentencing order issue after the evidentiary hearing. For the reasons explained below, we affirm the trial court's denial of relief on each of Rodriguez's claims.[7]

*1263 Mental Health Mitigation and Evaluation

Rodriguez argues the trial court erred in denying him a new penalty phase after testimony at the evidentiary hearing allegedly established trial counsel's failure to promptly and fully investigate mental health mitigation that would have affected the jury's decision. Moreover, Rodriguez claims the expert appointed to examine him, Dr. Leonard Haber, rendered inadequate assistance which contributed to trial counsel's ineffectiveness.
In order to prevail on a claim of ineffective assistance of counsel, Rodriguez must show both deficient performance by counsel and resulting prejudice from the deficient performance. See Strickland v. Washington, 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In deciding whether counsel was ineffective, we are required to examine not only counsel's alleged failure to investigate and present possibly mitigating evidence, but the reasons for doing so. See Rose v. State, 675 So.2d 567, 571 (Fla.1996). Moreover, the defendant has the burden of showing that counsel's ineffectiveness actually "deprived the defendant of a reliable penalty phase proceeding." Rutherford v. State, 727 So.2d 216, 223 (Fla.1998).
In the instant case, the trial court found trial counsel was not ineffective for failing to investigate because Rodriguez did not wish to involve his family. Trial counsel testified at the evidentiary hearing that "[i]t was difficult to talk to this defendant about the case, or what I was going to do. His position was this has nothing to do with me, even when he knew they were about to do these mental mitigators." Trial counsel also stated that Rodriguez did not want his family involved and refused to offer information that would have helped in the presentence investigation. This testimony reveals that trial counsel was limited by his client's lack of cooperation. As the Supreme Court noted in Strickland, "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." Strickland, 466 U.S. at 691, 104 S.Ct. 2052. Rodriguez's lack of cooperation undermines his allegations of ineffective assistance of counsel. See Sims v. Singletary, 155 F.3d 1297, 1316 (11th Cir. 1998) (finding counsel not deficient for failure to present additional mitigation evidence which counsel was unaware of due to defendant's refusal to assist him); Cherry v. State, 781 So.2d 1040 (Fla.2000) (finding no ineffective assistance of counsel in light of defendant's refusal to supply names of witnesses who would have testified on his behalf); Rose v. State, 617 So.2d 291, 294-95 (Fla.1993) (finding counsel was not ineffective for failing to call family members as witnesses where defendant told counsel that he had no contact with his family for several years and that his family's testimony would not be helpful).
Trial counsel was also questioned about his failure to travel to Cuba in order to *1264 interview Rodriguez's family, friends, and acquaintances and to search for possible mitigating evidence. The trial court concluded that trial counsel would not have been permitted to travel to Cuba. However, this finding is refuted by federal legislation existent at that time and still in effect today. See 31 C.F.R. § 515.560 (2004) (permitting travel-related transactions to, from, and within Cuba by persons subject to U.S. jurisdiction for a number of listed activities, including professionals conducting research related to their profession as long as a license is obtained). During the evidentiary hearing, trial counsel admitted he did not make a request to go to Cuba because he believed travel to that country was prohibited. Rodriguez argues that had trial counsel gone to Cuba, he would have been able to uncover the type of mitigating evidence presented by collateral counsel at the evidentiary hearing. This evidence, which collateral counsel gathered from interviews with Rodriguez's friends and family, reveals the following: family, peers, and teachers considered Rodriguez to be slow intellectually; there is a substantial family history of mental health problems including Rodriguez's father, grandparents, and other relatives; Rodriguez's family was impoverished; Rodriguez went without medical care even after he fell off a horse and sustained a head injury; Rodriguez was often beaten by family members including an uncle who once tied him to a tree and whipped him; and Rodriguez was sent to work camps by his family because they considered him uneducable.
In the past, this Court has found ineffectiveness where no attempt was made to investigate mitigation even though substantial mitigating evidence could have been presented. See Rose, 675 So.2d at 572; Hildwin v. Dugger, 654 So.2d 107, 109-10 (Fla.1995) (finding counsel ineffective for failing to investigate and discover substantial mitigation including prior psychiatric hospitalizations and statutory mitigation). At the same time, we have generally upheld cases where counsel has conducted an investigation which uncovered potential mitigation, but made a strategic decision not to present such evidence. See Jones v. State, 446 So.2d 1059 (Fla.1984) (finding counsel not ineffective for failing to introduce mental health examination which rendered an unfavorable diagnosis of defendant); Rose, 617 So.2d at 294 (same where psychologist determined defendant had an antisocial personality disorder and not organic brain disorder).
The record in this case shows that counsel did not render ineffective assistance to Rodriguez by failing to fully investigate mental health mitigation. This case is distinguishable from Wiggins v. Smith, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), in which counsel curtailed their investigation of mitigating evidence in favor of the alternative startegy of convincing the jury that the defendant was not directly responsible for the murder. In the instant case, the court appointed Dr. Haber to interview Rodriguez before the penalty phase. Dr. Haber filed a report indicating that he had interviewed Rodriguez on two separate occasions. That report included much of the mitigation that Rodriguez now raises, including the following: Rodriguez's birth and childhood in Cuba; his immigration to the United States as part of the Mariel boatlift; his injury after falling off a horse as a child; his desertion from the Merchant Marine and resulting incarceration in a Cuban prison; his imprisonment for four years in Washington, D.C., for cocaine trafficking; his temporary confinement in a Cuban psychiatric hospital; and two separate suicide attempts. Dr. Haber also noted that Rodriguez was able to explain his rejection of a *1265 plea offer, deny his participation in the murder, and appreciate the seriousness of the charges against him. Based on his interviews, Dr. Haber found that Rodriguez had no "suicidal or homicidal ideation" and seemed "alert ... responsive and cooperative."
Although Rodriguez's performance on several tests administered by Dr. Haber reflected evidence of visual-motor difficulty indicative of possible organic brain dysfunction, Dr. Haber concluded that Rodriguez was competent to stand trial. Rodriguez reported no history of symptoms or potential triggers of organic brain damage such as dizziness, headaches, blackouts or seizures, and no drug abuse. Dr. Haber could not substantiate the mental or emotional disturbance statutory mitigator. Dr. Haber commented that "the best evidence as to the existence of brain dysfunction would come from a complete neurological and neuropsychological examination." Based on Dr. Haber's concerns, trial counsel retained Dr. Noble David, a professor and acting chairman of Department of Neurology at the University of Miami School of Medicine, to conduct a neurological evaluation. Dr. David reported "no evidence of significant neurologic or brain disease." Dr. David's evaluation found that Rodriguez's speech, hearing, and sight were normal; he had no weakness in his extremities; he was oriented and answered questions appropriately; and he had no abnormalities in his motor, sensory and reflex abilities. In fact, the only thing that raised any question of brian damage for Dr. David were Rodriguez's reports of a childhood fall from a horse and two suicide attempts as an adult. In light of these events, Dr. David ordered an electroencephalogram which revealed no evidence of brain damage or abnormality. Trial counsel cannot be faulted for not pursuing further testing after obtaining these results.
At deposition questioning by the State, Dr. Haber admitted he had never tested Rodriguez's intelligence quotient (IQ). When asked by the State whether a low IQ or an individual's adaptive functioning was more indicative of mental retardation, Dr. Haber responded that you could not look at one factor without considering the other. According to Dr. Haber, the activities in which Rodriguez engaged (e.g., running a drug trafficking operation, balancing a bank account of $7000 at the time he was arrested, and understanding the mechanics of financing a new car) belied a finding of mental retardation.
Trial counsel was also questioned about his strategic decision not to call Dr. Haber as a witness in the penalty phase. Counsel explained that he made this decision in order not to open up Rodriguez's criminal history during cross-examination questioning by the State. As counsel explained, "I had nothing from Dr. Haber as to ... mental retardation," which he balanced against a history of prior felony convictions, including drug trafficking conviction and escape, that could have been revealed to the jury. In light of the fact that Dr. Haber's report did not substantiate the statutory mental health mitigators or mental retardation, counsel's decision not to put Dr. Haber on the stand and thereby open up Rodriguez's prior convictions to inquiry by the State was a reasonable decision.
Dr. Ruth Latterner, the mental health expert who evaluated Rodriguez for the postconviction proceedings, contradicted Dr. Haber's findings. After giving Rodriguez a series of cognitive exams, Dr. Latterner concluded that Rodriguez had a full scale IQ of 64 and a mental age of seven years. Dr. Latterner also found Rodriguez markedly sensitive to visual stimulation, which comports with organicity. Dr. Latterner further concluded that Rodriguez *1266 had impaired reasoning, suffered from impairments of judgment and organization, wanted to be positively perceived by Dr. Latterner, was likely to have been born retarded, and had a long-standing organic impairment. Dr. Latterner opined that Rodriguez had difficulty appreciating the criminality of his actions and had an impaired ability to conform his behavior to the requirements of the law. However, Dr. Latterner failed to ask Rodriguez anything about the day of the crime, including what his mental state was on that day, whether he was under duress or the influence of drugs, and whether he knew that what he had done was wrong.
Although all of the experts who examined Rodriguez concluded that he has low intelligence, Rodriguez's behavior throughout the trial proceedings indicated his awareness and understanding about what was happening in the courtroom. He variously made comments about the prosecutor's statements and the evidence presented, even denying his presence at the murder scene during one witness's testimony. Rodriguez's subsequent conversations with Dr. Haber, particularly one in which he recited the State's plea offer in detail, also indicate an understanding of the situation. These incidents support the trial court's finding that Dr. Haber's opinion was not only adequate, but also completely supported by the evidence. In denying postconviction relief on this claim, the court stated:
No doubt the defendant has a low IQ, but low IQ does not mean mental retardation. For a valid diagnosis of mental retardation under DSM IV there must also be deficits in the defendant's adaptive functioning. All the evidence points to no deficits. Additionally, there was no evidence at all that the defendant had any memory impairments or problems of impulsivity. Not only was Dr. Haber's opinion not inadequate but it is completely supported by the evidence. A conclusion by a new expert that is different is interesting but pales in an analysis of available facts and standards.
Rodriguez's conduct also supports the State's contention that although Rodriguez has a low IQ, he is not mentally retarded.[8] Thus, Rodriguez's claims are without merit. See Hall v. State, 742 So.2d 225 (Fla. 1999) (noting that although the defendant had several mental deficits which had required treatment for several years, all members of the defense team were aware of the impairments and the defendant understood the proceedings against him). Although trial counsel could have traveled to Cuba, his efforts would have uncovered substantially the same background information that was already known. Even if this evidence had been admitted, there is no reasonable probability that the outcome *1267 of this case would have been different. See Spencer v. State, 842 So.2d 52, 61 (Fla.2003) ("For the prejudice prong, the reviewing court must determine whether there is a reasonable probability that, but for the deficiency, the result of the proceeding would have been different."). Thus, Rodriguez cannot satisfy the prejudice prong of his claim of ineffective assistance in this regard.
Rodriguez also argues that section 921.137, Florida Statutes (2004), which prohibits imposition of the death sentence on mentally retarded defendants, is unconstitutional under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), because it permits a judge to make the factual determination of mental retardation. We have rejected similar claims attempting to "feed Atkins [v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) ] through Ring." Arbelaez v. State, 898 So.2d 25, 43 (Fla.2005). Rodriguez "has no right under Ring and Atkins to a jury determination of whether he is mentally retarded." Id. Thus, there is no merit to his claim regarding the constitutionality of the statute.
Additionally, Rodriguez argues that his mental health claim should be revisited in light of the United States Supreme Court's decision in Atkins, holding that the execution of mentally retarded defendants violates the Eighth Amendment of the United States Constitution. Rodriguez concedes that the mental health claim presented to the trial court was based on an alleged failure of trial counsel to investigate and present evidence of his mental retardation. However, Rodriguez now argues that the trial court should have considered his right not to be executed due to mental retardation. Rodriguez also filed a motion to relinquish jurisdiction in order for him to file a motion for determination of mental retardation pursuant to rule 3.203. In light of our ruling on that motion, Rodriguez may file his 3.203 motion at the trial court upon disposition of this postconviction appeal. Thus, we decline to address his Atkins claim in this proceeding.
Finally, within his claim for ineffective assistance of counsel, Rodriguez also alleges that he was deprived of his right to an evaluation by a competent mental health expert pursuant to Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). This claim is procedurally barred because it could have been raised on direct appeal. See Marshall v. State, 854 So.2d 1235, 1248 (Fla.2003); Cherry v. State, 781 So.2d 1040, 1047 (Fla. 2000) ("[T]he claim of incompetent mental health evaluation is procedurally barred for failure to raise it on direct appeal.").

Preparation of Sentencing Order
Rodriguez argues the State prepared the sentencing order at the direction of Judge Thomas Carney in violation of Florida law and that trial counsel failed to object. See State v. Riechmann, 777 So.2d 342 (Fla.2000) (concluding that defendant was denied an independent weighing of aggravating and mitigating circumstances because trial judge, through ex parte communication with the prosecutor, delegated the responsibility to the prosecutor to write the order sentencing defendant to death); Card v. State, 652 So.2d 344 (Fla. 1995); Patterson v. State, 513 So.2d 1257 (Fla.1987). Rodriguez predicates this claim upon an exact but unsigned copy of the sentencing order that postconviction counsel found in the state attorney's files.
Although this claim was raised in Rodriguez's fourth amended motion, which was rejected by the trial court, we found the allegations serious enough to warrant closer examination and postconviction relief if proven true. See Rose v. State, 601 So.2d 1181, 1183 (Fla.1992) (concluding that trial *1268 court erred by not conducting evidentiary hearing on claim of ex parte communication based upon State's possession of copy of unsigned sentencing order). Accordingly, we temporarily relinquished jurisdiction to the trial court to hold such a hearing.
Rodriguez filed a motion to disqualify Judge Carney from presiding over the relinquishment hearing on the grounds that the judge was a material witness to the sentencing order claim. The case was reassigned to Judge Victoria Sigler, who conducted an evidentiary hearing and heard testimony from Judge Carney, the lead prosecutor, Rodriguez's trial counsel, and his postconviction counsel. Postconviction counsel testified that she had discovered an unsigned copy of the sentencing order in the state attorney's file, which had been provided under a public records request, that she had no knowledge of how or when the unsigned order was placed in the file, and that she had no knowledge about the author of the sentencing order. Postconviction counsel also testified that the presence of the unsigned order in the state attorney's file was enough to raise the possibility that the State had authored the order as this had occurred in a number of other cases. Trial counsel testified that he could not recall whether the copies of the order distributed at the sentencing hearing were signed by the judge or not. The prosecutor testified "unequivocally" that no one from the state attorney's office prepared the Rodriguez sentencing order, that he did not write the order, and that he did not ask anyone in the office to prepare a sentencing order. The prosecutor also testified that the style of the order was not similar to those that had been prepared by the state attorney's office in other cases. The prosecutor speculated that, based on the transcript of the sentencing hearing, unsigned copies of the sentencing order were distributed to the parties at the hearing and that is why an unsigned order was in his file. Judge Carney testified that he could not explain how the unsigned order got into the state attorney's file, but speculated that unsigned copies of the order had erroneously been supplied to the parties at the end of the sentencing hearing. The judge also testified that he had drafted the Rodriguez sentencing order and asked his judicial assistant to type it and that he never asked either party to provide him with a proposed order.
In denying postconviction relief on this claim, the trial court found the judge and the prosecutor to be credible in their accounts of the drafting of the order and postconviction counsel to be credible in her account of finding the unsigned order in the state attorney's file after a public records request. After weighing all of the testimony, the trial court found that Rodriguez "failed to demonstrate by a preponderance of the evidence that the sentencing order was not drafted and prepared by [the judge] in this case." Furthermore, Rodriguez failed to convince the court that "any member of the Office of the State Attorney was responsible for drafting and or preparing the sentencing order in this case." Thus, the court denied relief on the sentencing order claim. In his supplemental brief filed after the relinquishment proceedings, Rodriguez asserts that the trial court erred in denying him relief on this issue.
In reviewing the denial of a 3.850 claim where the trial court has conducted an evidentiary hearing, this Court generally affords deference to the trial court's factual findings. See Blanco v. State, 702 So.2d 1250, 1252 (Fla.1997). "[A]s long as the trial court's findings are supported by competent substantial evidence, this Court will not `substitute its judgment for that of the trial court on *1269 questions of fact, likewise of the credibility of the witnesses as well as the weight to be given to the evidence by the trial court.'" McLin v. State, 827 So.2d 948, 954 n. 4 (Fla.2002) (quoting Blanco, 702 So.2d at 1252).
In the instant case, the trial court's findings involve questions of fact and the credibility of the witnesses. Moreover, these findings are supported by competent, substantial evidence in the record of the evidentiary hearing. Both the prosecutor and the trial judge offered unqualified testimony about the authorship of the sentencing order. Rodriguez presented no evidence to contradict this testimony.
Rodriguez's claim is almost identical to that presented in Jones v. State, 845 So.2d 55, 64 (Fla.2003), which this Court characterized as "ultimately based on speculation." As in Jones, Rodriguez "produced no direct evidence that the prosecutor. . ., and not the trial judge, wrote the sentencing order." Id. at 63. Similarly, the prosecutor in the instant case testified without qualification that he did not write the sentencing order and offered a plausible explanation as to why he possessed a copy of a proposed sentencing order. "[W]ithout more, [this does not] constitute evidence of improper ex parte contact." Id. at 64. "Postconviction relief cannot be based on speculative assertions." Id.
Rodriguez offers nothing more than such "speculative assertions" in the face of direct testimony that refutes his claim that the State drafted his sentencing order. He is not entitled to relief on this claim.

Guilt Phase Claims
Rodriguez contends the trial court erred in denying his guilt phase claims which include a Brady claim, an Ake claim, and claims that counsel rendered ineffective assistance by an alleged failure to investigate and prepare for trial and to request a severance.
Rodriguez claims the State violated Brady by failing to disclose evidence that Carlos "Tata" Sponsa was the organizer and perpetrator of the crime. Rodriguez claims that had this information been disclosed, it would have changed his trial strategy and defense.
To establish a Brady violation, the defendant must show the following: (1) that the evidence at issue is favorable to him, either because it is exculpatory or because it is impeaching; (2) that the evidence was suppressed by the State, either willfully or inadvertently; and (3) that the suppression resulted in prejudice. Sochor v. State, 883 So.2d 766, 785 n. 23 (Fla. 2004). Rodriguez has not, and cannot, demonstrate that the State suppressed the information in question. During closing argument of the guilt phase, Rodriguez's trial counsel argued that Tata was the mastermind behind the crime, had obtained "inside" information about the victim's schedule from a former employee of the victim, planned the crime with Fernandez, and had chosen Rodriguez as a scapegoat. This is the very information that Rodriguez now alleges the State withheld from him. Thus, the record refutes Rodriguez's Brady claim.
Intertwined with the Brady claim, Rodriguez also argues that the State committed a Giglio[9] violation by presenting testimony "it knew or should have known was false" regarding Rodriguez's role in the crime, including the testimony of Ramon Fernandez identifying Rodriguez as the shooter. A Giglio violation is established when a petitioner shows that (1) a witness gave false testimony; (2) the prosecutor knew the testimony was false; *1270 and (3) the statement was material. Sochor, 883 So.2d at 785 n. 23. Rodriguez has not shown that the testimony presented was actually false or that the prosecutor had any knowledge of allegedly false testimony. In fact, Fernandez's testimony was consistent with other witnesses who testified at trial about Rodriguez's role in the crime.
Thus, we conclude that the summary denial of Rodriguez's Brady/Giglio claim was proper. See Gorby v. State, 819 So.2d 664, 676 (Fla.2002) (rejecting Brady and Giglio claims as insufficiently pled or wholly conclusory).
Next, Rodriguez alleges that the trial court should have granted an evidentiary hearing on his claim that counsel was ineffective for failing to abide by the mandate of Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). Under Ake, trial counsel is required to seek mental health assistance for a client whose mental condition is at issue. The record refutes Rodriguez's claim that trial counsel was deficient in this respect. Three days after the guilt phase ended, defense counsel filed a motion asking the court to appoint an independent mental health expert for Rodriguez. As a result, Dr. Haber conducted an evaluation and concluded that Rodriguez was competent to proceed with the penalty phase. Dr. Haber also reported that Rodriguez might be suffering from organic brain dysfunction, but further testing would only be required to confirm this. However, Dr. Haber opined that even if brain damage was present, it was unlikely to provide statutory mitigation in light of Rodriguez's history which did not include evidence of impaired functioning. Subsequently, a neurologist conducted an examination of Rodriguez and administered an electroencephalogram. Neither revealed brain damage. As discussed above, counsel made a strategic decision not to present Dr. Haber's testimony during the penalty phase in order not to expose Rodriguez's extensive criminal history through cross-examination questioning. This evidence refutes Rodriguez's claim that trial counsel failed to provide him with an adequate mental health evaluation. Thus, the trial court properly denied this claim.
Rodriguez also claims that the trial court erred in summarily denying various claims of ineffective assistance of counsel during the guilt phase of the trial. Counsel's alleged deficiencies include: failing to list Jose Montalvo, a worker in a cafeteria near the crime scene who waited with the victim until emergency personnel arrived, as a defense witness and to procure his appearance at trial; failing to discuss the plea agreement with Rodriguez; failing to refute the State's theory that Rodriguez planned the crime; failing to request a severance of the charges; failing to object to the identification testimony of the victim's sister-in-law; and failing to object to the jury instruction on expert witnesses. For the reasons explained below, we find the trial court's summary denial proper as to each of these claims of ineffective assistance of counsel.
In his deposition testimony to defense counsel over a year after the shooting, Montalvo testified that the victim described his shooter as little and fat, adjectives which are not descriptive of Rodriguez who is tall and thin. Rodriguez asserts that Montalvo's testimony would have contradicted that of a police officer who testified that the victim described his assailant as tall and thin. Rodriguez contends that trial counsel was unable to present Montalvo's testimony at trial because counsel failed to list Montalvo as a witness as required by Florida Rule of Criminal Procedure 3.220(d)(1)(A). While it is true that trial *1271 counsel failed to list Montalvo as a trial witness, this failure in and of itself does not mean that Montalvo would have been excluded from testifying at trial had he been present. See Tomengo v. State, 864 So.2d 525, 529 (Fla. 5th DCA 2004) ("Excluding a defense witness because the defense failed to disclose the witness, or to timely disclose the witness, is a `severe sanction' that `should be a last resort reserved for extreme or aggravated circumstances.'") (quoting Livigni v. State, 725 So.2d 1150, 1151 (Fla. 2d DCA 1998)). Counsel did subpoena Montalvo and attempted to procure his testimony for trial. Montalvo left town before being called to testify and could not be located despite counsel's efforts to do so. Finally, even if counsel's performance was deficient in this regard, Rodriguez cannot show prejudice. Montalvo gave contradictory accounts to the police and prosecutor shortly after the crime, stating that the victim gave him no description of his assailants. Additionally, even if Montalvo had testified at trial and had testified consistent with his deposition statement, his testimony would have been contradicted by a number of witnesses who either described the shooter as tall and thin or identified Rodriguez as the assailant and contradicted by Rodriguez's own admissions about committing the crime.
Rodriguez's claim that trial counsel did not discuss the plea agreement with him is also refuted by the record. The State informed the trial court about its plea offer and trial counsel indicated that Rodriguez had refused the offer. When questioned by the court, Rodriguez stated that he had refused the plea because he did not commit the crime. Additionally, Dr. Haber's deposition testimony specifically notes his discussion with Rodriguez about the proffered agreement. Rodriguez told Dr. Haber that he had discussed the plea offer with his attorney, but refused it because he did not commit the crime and would rather be dead than go to prison. Thus, this claim is without merit and was properly denied.
Rodriguez also claims trial counsel was ineffective for failing to refute the State's theory that Rodriguez planned the crime. However, trial counsel aggressively cross-examined the State's witnesses, pointed out inconsistencies in prior statements made by key witness Fernandez, and emphasized Fernandez's plea agreement with the State. During closing argument, counsel also argued that Rodriguez had nothing to do with this crime and that Tata and Fernandez were the true perpetrators. Thus, trial counsel vigorously litigated these issues and his performance was not deficient in this regard. Rodriguez's real claim appears to be that counsel did not prevail on this defense at trial. This does not constitute ineffective assistance and relief was properly denied. See Teffeteller v. Dugger, 734 So.2d 1009, 1020 (Fla.1999).
Rodriguez also claims ineffectiveness based on counsel's failure to request a severance of the homicide charges from the charges related to the home invasion robbery and shooting. Rodriguez alleges that the jury was contaminated by the consideration of the home invasion evidence. Florida Rule of Criminal Procedure 3.150(a) provides for the joinder of offenses when the offenses are "based on the same act or transaction or on [two] or more connected acts or transactions." The offenses here were interconnected. Rodriguez used the gun taken from the murder victim during the home invasion the next day. In fact, the gun was recovered from that scene. The two crimes involved common participants. On the way to the home invasion, Rodriguez admitted his involvement in the events of the previous day and *1272 told his companion that the Rolex watch on his arm had been stolen from the victim at the auto parts store. The crimes were also part of a common scheme to obtain money so that Rodriguez could pay money he owed to a bondsman. The two crimes were also connected by temporal and geographic proximity. Thus, even if counsel had requested a severance of the crimes, he was not likely to prevail. See Livingston v. State, 565 So.2d 1288, 1290 (Fla. 1990) (finding no error in consolidating burglary and murder-robbery charges in same trial because the crimes were connected in "an episodic sense because they occurred only hours apart in the same small town and because the pistol stolen in the burglary became the instrument for effecting the armed robbery and murder"). Therefore, this claim is without merit and was properly denied.
Rodriguez also complains that counsel should have objected when the deceased victim's sister-in-law was permitted to give identification testimony. As a general rule, members of a victim's family should not identify a victim at trial where nonrelated, credible witnesses are available to make such identification. See Welty v. State, 402 So.2d 1159 (Fla.1981). This rule prevents the interjection of matters not germane to the issue of guilt and ensures that the sympathy of the jury is not evoked by the emotional testimony of a family member. Id. However, the sister-in-law's testimony related to matters beyond identification of the victim, including identification of property on the victim's person at the time of the shooting and a recounting of the victim's statements to her immediately after he was shot. Therefore, counsel was not deficient in failing to object to this testimony. See Mills v. State, 462 So.2d 1075, 1079 (Fla.1985) (finding no error in allowing victim's father to testify to identify stolen property). Furthermore, the record does not indicate that this testimony had the underlying purpose of gaining the sympathy of the jury or of prejudicing it against Rodriguez. Id. Thus, the claim was properly denied by the trial court.
Finally, Rodriguez claims that the standard jury instruction on considering expert testimony was erroneous and counsel was ineffective for failing to object. Any substantive challenge to this jury instruction is procedurally barred because it should have been raised on direct appeal. See Thompson v. State, 759 So.2d 650, 665 (Fla.2000). Additionally, "trial counsel's failure to object to standard jury instructions that have not been invalidated by this Court does not render counsel's performance deficient." Id.; see also Gamble v. State, 877 So.2d 706, 712 (Fla.2004). The standard instruction on expert witnesses, which was given in this case, has not been invalidated by this Court. Thus, this claim was properly denied.

Public Records
Rodriguez raises several claims relating to his public records requests pursuant to Florida Rule of Criminal Procedure 3.852. Rodriguez contends that several agencies have not complied with his requests; the trial court improperly withheld other records after conducting an in-camera review; the trial court refused to hear his motion to compel production of supplemental public records; and he was denied the opportunity to fully litigate his requests by the trial court's refusal to consider his fourth amended postconviction motion, which incorporated claims arising from supplemental records he had received.
The record contains extensive documents and correspondence relating to Rodriguez's public records requests. The record also reveals that a number of hearings were devoted to the public records issues, *1273 including hearings in December 1996 and April 1997 on Rodriguez's motions to compel the production of public records. At both hearings, representatives from a number of state agencies testified about their compliance with Rodriguez's requests. Further, the court granted postconviction counsel leave to file amended motions to vacate after the requests were supplied.
Rodriguez made supplemental public records requests in May 1997. While a number of agencies filed notices of compliance, others filed objections and requests for protective orders from the trial court, arguing that the requests were vague and overbroad. Rodriguez filed a supplemental motion to compel the production of outstanding records and a third amended motion to vacate in August 1997. On the day of the scheduled Huff hearing on Rodriguez's third amended motion to vacate in March 1998, counsel attempted to file a fourth amended motion. The court ruled the amendment untimely and ordered counsel to proceed with the Huff hearing on the third amended motion.
The record shows extensive compliance with Rodriguez's public records requests.[10] Furthermore, the trial court did allow Rodriguez to make continued amendments of his motion to vacate as more public records became available. Even as late as a June 1998 hearing, the trial judge granted Rodriguez leave to amend his motion based on new claims discovered in recently obtained public records.
Despite Rodriguez's contention that records remain missing, he fails to plead with particularity the exact records that remain outstanding and the relevance of such records. We have consistently held that a defendant must plead with specificity the outstanding public records he seeks to obtain. See Johnson v. State, 769 So.2d 990, 995-96 (Fla.2000); Thompson v. State, 759 So.2d 650, 659 (Fla.2000). Rodriguez's public records requests in this case have been unduly broad and vague.[11] In fact, several of the agencies filed objections and requested protective orders to the requests on this very basis. This Court has held similar requests to be overly broad, of questionable relevance, and unlikely to lead to discoverable evidence. See Mills v. State, 786 So.2d 547, 552 (Fla.2001). We conclude that Rodriguez has not met his burden of showing that the allegedly missing records will lead to new *1274 information. For these reasons, Rodriguez is not entitled to relief on this claim.

Judicial Disqualification
Rodriguez asserts that Judge Carney should have disqualified himself from presiding over the postconviction proceedings on the basis of judicial bias at trial and alleged ex parte communications during the postconviction proceedings. Over the course of these lengthy postconviction proceedings, Rodriguez made many motions to disqualify Judge Carney from the postconviction proceedings. Rodriguez is not entitled to relief on any of these claims. At the outset we note that any claim of judicial bias during trial should have been raised on direct appeal and is procedurally barred in this postconviction proceeding. See Smith v. State, 445 So.2d 323, 325 (Fla.1983) ("Issues which either were or could have been litigated at trial and upon direct appeal are not cognizable through collateral attack.").
Rodriguez also asserts that Judge Carney engaged in several ex parte communications during the postconviction proceedings which should have resulted in the judge's disqualification. At the September 15 status hearing, which Rodriguez's counsel participated in via telephone, the state attorney claimed that certain handwritten notes from the state attorney's file were not public records and gave these documents to the judge for an in-camera inspection. Defense counsel protested this action as depriving Rodriguez of a meaningful opportunity to present argument as he had no idea what these documents were. However, counsel did not file a motion to disqualify the judge on this basis until November 1996. A motion to disqualify is procedurally governed by Florida Rules of Judicial Administration 2.160, which provides that "[a] motion to disqualify shall be filed within a reasonable time not to exceed 10 days after discovery of the facts constituting the grounds for the motion and shall be promptly presented to the court for an immediate ruling." Fla. R. Jud. Admin. 2.160(e). Thus, Rodriguez's motion was not timely filed, and any claim relating to this is procedurally barred.
In June 1996, Rodriguez filed another motion to disqualify Judge Carney based on an alleged ex parte communication between the state attorney and the judge regarding the nature of a scheduled hearing on Rodriguez's postconviction motion. The motion alleged that when postconviction counsel called the judge to set a matter for hearing the judge's judicial assistant stated that an evidentiary hearing on the public records issue, and not a status hearing, had been scheduled. The motion further alleged that not only was an evidentiary hearing inappropriate as all agencies had not yet complied with Rodriguez's public records request, but also that the judge must have engaged in ex parte communication with the state attorney to be informed that there had been substantial compliance with the public records requests. After receiving written memoranda from the parties, the judge denied this motion without hearing.
In considering a motion to disqualify, a court is limited to determining the legal sufficiency of the motion itself and may not pass on the truth of the facts alleged. Fla. R. Jud. Admin. 2.160(f); see also Suarez v. Dugger, 527 So.2d 190 (Fla. 1988). Whether the motion is legally sufficient requires a determination as to whether the alleged facts would create in a reasonably prudent person a well-founded fear of not receiving a fair and impartial trial. See MacKenzie v. Super Kids Bargain Store, Inc., 565 So.2d 1332 (Fla.1990). In Rose v. State, 601 So.2d 1181, 1183 (Fla.1992), this Court held that "a judge *1275 should not engage in any conversation about a pending case with only one of the parties participating in that conversation. Obviously, we understand that this would not include strictly administrative matters not dealing in any way with the merits of the case."
Taking Rodriguez's allegations as true  that the state attorney informed the judge that the hearing was not a status hearing, but an evidentiary hearing on the public records requests  this communication appears to be purely administrative in nature. See Arbelaez v. State, 775 So.2d 909, 916 (Fla.2000) (concluding that alleged ex parte communications related to time period for the State to file its response to the defendant's 3.850 motion, setting a date for an evidentiary hearing, and setting a date for the defendant's public records hearing were purely administrative). The state attorney simply informed the judge of the nature of a hearing the essence of which  a discussion about public records compliance  remained the same whether the hearing was classified as a status conference or an evidentiary hearing. Such "strictly administrative matters ... are not prohibited." Id. Thus, this ground for disqualification was not legally sufficient and Rodriguez is not entitled to relief on this claim.
In December 1996, Rodriguez filed another motion to disqualify the judge based on the proceedings that transpired during a hearing on Rodriguez's motion to compel public records, held ten days earlier. During the hearing, the judge noted that he had excused several records custodians subpoenaed by Rodriguez from attending the hearing. Defense counsel requested a stay of the proceedings in order to file a motion for recusal, which the judge denied. The judge explained that Rodriguez had served the subpoenas on these witnesses only one day before the hearing and the witnesses rightly claimed that their attendance was an undue burden and a violation of section 48.031(4), Florida Statutes (1995), which governs service of witness subpoenas on government employees and law enforcement officers in their official capacity.[12] During this hearing, the parties also discussed the documents given to the judge for an in-camera inspection in September 1995 and subsequently lost. The state attorney testified that she removed certain documents from the state attorney's file that she believed to be exempt from the public records law. The documents included the prosecutors' notes in preparation for witness questioning, notes regarding opening and closing statements, and notes made during voir dire questioning. The state attorney gave the original documents to the court for an incamera inspection, but neglected to make copies of the documents. Several days later, the judge issued a ruling that the documents were not public records and thus not subject to disclosure. Some months later, the state attorney realized that she had not received the original documents back and contacted the clerk of the court to determine if the originals had been included in the court file. When the clerk could not locate the documents, the state attorney contacted the judge's judicial assistant to determine if the missing documents were still in the judge's chambers. In July 1996, ten months after the in-camera inspection, the state attorney sent a letter to the judge, with a copy to Rodriguez's postconviction *1276 counsel, advising of the unsuccessful attempt to locate the missing documents and the need to discuss the matter at the next status hearing or during the hearing on the motion to compel. The state attorney testified that she never spoke directly to the judge about the status of the documents.
Because the judge was the last person to have possession of these documents, Rodriguez called the judge to testify about the documents and their status. Postconviction counsel orally renewed his disqualification motion based upon the judge's participation as a witness in the proceedings. The motion was denied. The judge testified that the state attorney gave him the documents in a manila envelope; during an in-camera inspection, he concluded that the documents were not public records; and he returned the documents to the manila envelope. From that point on, the judge did not know what had become of the envelope and could not locate it after an exhaustive search of his office. After this hearing, Rodriguez filed a written motion to disqualify the judge based on the judge's conversations with the subpoenaed witnesses and his participation as a witness at the evidentiary hearing.
The judge's mere participation in the ex parte conversations with the subpoenaed witnesses was not sufficient to establish a well-founded fear of bias or prejudice towards the defendant. Cf. Parnell v. State, 627 So.2d 1246, 1247 (Fla. 3d DCA 1993) (concluding that judge's ex parte conversation with prosecutor, which was necessary to ensure safety of witness, was not sufficient to necessitate disqualification). In the instant case, the trial judge had no choice but to take part in these conversations with the subpoenaed witnesses in light of Rodriguez's untimely service of the subpoenas and the witnesses' inability to file proper motions for protective orders on such short notice.
As noted above, any claim of ex parte communication regarding the documents is procedurally barred. However, the claim regarding the judge's participation as a witness at the December 1996 public records hearing is cognizable as this is a separate and distinct claim. We have previously held that the need to have a judge testify is limited in scope and particularly applies to factual matters that are outside the record. See Rivera v. State, 717 So.2d 477 (Fla.1998); State v. Lewis, 656 So.2d 1248 (Fla.1994).
Florida Rule of Judicial Administration 2.160(d)(2) requires a trial judge to disqualify himself if the judge is a "material witness for or against one of the parties to the cause." See also § 38.02, Fla. Stat. (2004); Canon 3(E)(1)(b), Code of Jud. Conduct. A material witness is one "who gives testimony going to some fact affecting the merits of the cause and about which no other witness might testify." Wingate v. Mach, 117 Fla. 104, 157 So. 421, 422 (1934) (defining "material witness" as contemplated by chapter 16053, Laws of Florida (1933), the predecessor to section 38.02); see also Van Fripp v. State, 412 So.2d 915, 915 (Fla. 4th DCA 1982) (concluding that the trial judge did not err in denying the defendant's motion to disqualify where the defendant failed to "demonstrate conclusively that the trial judge possessed relevant information `going to some fact affecting the merits of the cause and about which no other witness might testify'") (quoting Wingate). In this case, Judge Carney's testimony was limited to a physical description of the missing documents,[13] his recollection of *1277 how he handled the documents,[14] and his efforts to locate them after being notified that the documents were missing.[15] He did not testify about the nature of the missing documents or why he ruled that the documents were not public records. Accordingly, Judge Carney's testimony was neither "for or against one of the parties" nor "going to some fact affecting the merits" of Rodriguez's public records claim. His testimony was strictly informational and was elicited in an attempt to locate the missing documents. Thus, Judge Carney was not a material witness as contemplated by rule 2.160(d)(2), section 38.02, and Canon 3(E)(1)(b), and the motion to disqualify was properly denied.
Rodriguez filed another motion to disqualify in March 1998, based upon the unsigned copy of the sentencing order found in the state attorney's file. When Rodriguez raised this issue on appeal, we temporarily relinquished jurisdiction in order for the trial court to conduct an evidentiary hearing and make additional findings and conclusions. As a supplemental claim after the relinquishment of jurisdiction, Rodriguez contends that Judge Carney should have disqualified himself from presiding over Rodriguez's original postconviction proceedings based on the sentencing order claim and that his refusal to do so should result in this Court vacating all of the judge's subsequent rulings. In light of the proceedings during relinquishment and the evidence adduced at the hearing, we find no merit to this claim.
In March 1998, Rodriguez attempted to raise the sentencing order claim in a fourth amended postconviction motion which he tendered at the Huff hearing on his third amended motion. Rodriguez simultaneously filed a motion to disqualify Judge Carney based on his being a material witness in the sentencing order claim. The trial court denied Rodriguez's ore tenus motion to file his fourth amended motion for postconviction relief which contained the sentencing order claim. The judge ruled that the amended postconviction motion was untimely and hearing would proceed on the third amended motion. The judge denied the motion to disqualify without explanation. While the sentencing order claim raised factual questions that required an evidentiary hearing and relinquishment of jurisdiction by this Court, the trial court ultimately found no merit to the sentencing order claim after hearing testimony from Rodriguez's trial counsel and postconviction counsel, the trial judge, and the prosecutor. See supra pp. 1267-69.
The sentencing order claim was not part of the postconviction motion that Judge Carney ruled upon in the original proceedings, nor did Judge Carney rule on the truthfulness of the allegations related to the sentencing order claim. He merely denied the eleventh-hour amendment of the postconviction motion as untimely. Therefore, the judge's denial of the motion to disqualify was not improper.
Rodriguez also complains that Judge Carney erred in failing to recuse himself during the relinquishment proceedings. When presented with a motion to disqualify, Judge Carney "stepped aside" for a *1278 determination of whether he was a material witness in this case. From this point forward, Judge Victoria Sigler, who was assigned to preside over the determination of Judge Carney's status as a material witness, presided over all of the hearings and issued all of the court's rulings, including the order denying relief on the sentencing order claim. Thus, while Judge Carney did not formally recuse himself during relinquishment proceedings, this was the actual result of his "stepping aside." Judge Carney did not preside over the postconviction hearings and did not issue any orders during the relinquishment. Rodriguez was not prejudiced in any way by Judge Carney's failure to formally recuse himself during the postconviction proceedings held during the relinquishment of jurisdiction.

Full and Fair Hearing
Rodriguez contends that he was not afforded a full and fair hearing on the sentencing order issue during relinquishment of jurisdiction. Rodriguez alleges that his due process rights were violated by the manner in which the case was assigned to another judge and by his inability to depose the trial judge and the prosecutors prior to the evidentiary hearing.
As explained above, Rodriguez moved to disqualify the original trial judge upon relinquishment of jurisdiction by this Court. However, the judge refused to disqualify himself and merely "stepped aside" for a determination of whether he was a material witness in the claim. Judge Sigler, another judge in the division from which the case originated, was assigned to make that determination. To Judge Sigler's credit, she took control of the case  presiding over the evidentiary hearing on the claim, hearing testimony from Judge Carney and the other witnesses, and issuing all of the court's rulings during the relinquishment period.
Rodriguez now complains that the assignment of Judge Sigler departed from the local administrative procedure for reassignment of cases in the criminal division. The procedure promulgated by the chief judge of the Eleventh Judicial Circuit provides that upon recusal or disqualification of the presiding judge in a case in the criminal division, the case will be reassigned by the clerk of the court under a blind filing system. Here, Rodriguez argues, the State violated the procedure by suggesting a judge from the criminal division to make the determination of whether the trial judge was a material witness or not. We agree with the State that Rodriguez has no standing to raise this issue. Litigants have no standing to enforce internal court policy and have no right to have any particular judge hear their case. Kruckenberg v. Powell, 422 So.2d 994, 996 (Fla. 5th DCA 1982) ("A litigant does not have standing to enforce internal court policy, which is a matter of judicial administration and the proper concern of the judges of the particular court and of the administrative supervision of the judicial system."); 13 Fla. Jur.2d Courts and Judges § 292 (1998). "Administrative orders evidencing internal matters of self-government of the court do not limit the lawful authority of any judge of the court, nor do they bestow rights on litigants." Kruckenberg, 422 So.2d at 996; see also Adler v. Seligman of Fla., Inc., 492 So.2d 730, 732 (Fla. 4th DCA 1986). The mere departure from a random assignment procedure is insufficient to overturn a decision; a litigant must establish prejudice from any improper judicial assignment. See Jonathan L. Entin, The Sign of "The Four": Judicial Assignment and the Rule of Law, 68 Miss. L.J. 369 (1998) (explaining that assignment rules are essentially "internal housekeeping rules" designed to *1279 promote judicial efficiency, so courts have wide discretion in this field).
Rodriguez is not alleging any prejudice from the assignment of Judge Sigler, nor did he seek to disqualify the judge under the rules. See Allen v. Bridge, 427 So.2d 249, 250 (Fla. 4th DCA 1983) (explaining that while litigants have no standing to enforce internal court policy, they are free to seek disqualification of reassigned judges under rules of judicial administration and statute governing disqualification). Thus, he is not entitled to relief on this claim.
Rodriguez also claims that he was denied due process when the trial court denied his motions to depose the trial judge and the two trial prosecutors about who authored the sentencing order. The trial court heard arguments from both sides before denying the motions. At this motion hearing, the State provided Rodriguez with affidavits from the lead prosecutor and the trial judge's judicial assistant regarding the authorship of the sentencing order. In the order denying the motions to depose, the trial court noted that there is no general provision in the criminal rules which entitled Rodriguez to discovery in his postconviction proceedings; that Rodriguez had not shown a good cause to order these depositions because the lead prosecutor had agreed to talk to Rodriguez in the presence of the assistant state attorney; and that the court would entertain a motion for continuance if either party demonstrated being surprised by the witness testimony at the hearing.
In State v. Lewis, 656 So.2d 1248, 1249 (Fla.1994), this Court held that it is within the trial judge's inherent authority to allow limited prehearing discovery during postconviction proceedings. We set forth the following parameters for such discovery: the motion seeking discovery must set forth good reason; the court may grant limited discovery into matters which are relevant and material; the court may set limits on the sources and scope of such discovery; and on review of orders limiting or denying discovery, the moving party has the burden of showing an abuse of discretion. Id. at 1250 (quoting Davis v. State, 624 So.2d 282 (Fla. 3d DCA 1993), and adopting procedures established therein). In deciding whether to allow this limited form of discovery, the trial judge must consider "the issues presented, the elapsed time between the conviction and the postconviction hearing, any burdens placed on the opposing party and witnesses, alternative means of securing the evidence, and any other relevant facts." Id. Our opinion did not expand the discovery procedures established in Florida Rule of Criminal Procedure 3.220, which governs discovery, nor was the opinion to be interpreted as automatically allowing discovery in postconviction proceedings. We further cautioned that a trial judge's inherent authority to permit postconviction discovery "should be used only upon a showing of good cause." Id. While a party may be allowed to take postconviction depositions of the trial judge, this should only occur when the testimony of the judge is "absolutely necessary to establish factual circumstances not in the record," provided that the procedures set forth in the opinion are followed and the judge's thought process is not violated. Id. "The need to have a trial judge testify is very limited in scope and particularly applies only to factual matters that are outside the record." Id. at 1250 n. 3.
Thus, the denial of Rodriguez's motions to depose the trial judge and the two prosecutors must be reviewed under the abuse of discretion standard. Further, Rodriguez has the burden of showing that the trial court abused its discretion in denying the motions to depose. Here, Rodriguez *1280 was able to interview both of the prosecutors, albeit not under oath, prior to the evidentiary hearing. The State also provided Rodriguez with prehearing affidavits from the lead prosecutor and the judicial assistant about the authorship of the sentencing order. Rodriguez was able to question both the lead prosecutor and the trial judge at the evidentiary hearing. He could have called the second prosecutor and the judicial assistant as witnesses as well, but chose not to do so. Finally, as provided in the order denying the motions to depose, Rodriguez could have asked for a continuance of the evidentiary hearing if he had been surprised by the testimony of the witnesses. He never did so. Under these circumstances, we conclude that the trial court did not abuse its discretion in denying the motions to depose. Thus, Rodriguez is not entitled to relief on this claim.

Jury Instructions
Rodriguez also claims that trial counsel's failure to object to a number of jury instructions constituted ineffective assistance. These include instructions on the aggravating circumstances, an alleged "burden shifting" instruction on the weight of the aggravating and mitigating circumstances, an instruction that allegedly diluted the jury's sense of responsibility for sentencing, and the instruction concerning the aggravating circumstance that the murder was committed in the course of a felony, which Rodriguez contends resulted in an automatic aggravating circumstance.
Claims regarding the adequacy or constitutionality of jury instructions should be raised on direct appeal. See Thompson v. State, 759 So.2d 650, 665 (Fla.2000) (stating that substantive challenges to jury instructions are procedurally barred in postconviction challenges because the claims can and therefore should be raised on direct appeal). Moreover, we will not consider such procedurally barred claims under the guise of ineffective assistance of counsel. See Freeman v. State, 761 So.2d 1055, 1067 (Fla.2000) (holding that claims that could have been raised on direct appeal cannot be relitigated under the guise of ineffective assistance of counsel).
When jury instructions are proper, the failure to object does not constitute deficient performance by counsel. Cherry v. State, 781 So.2d 1040, 1054 (Fla.2000); Mendyk v. State, 592 So.2d 1076, 1080 (Fla.1992), receded from on other grounds by Hoffman v. State, 613 So.2d 405 (Fla. 1992). The instruction that purportedly diluted the jury's responsibility for its sentencing role is consistent with Florida's statutory scheme in which the jury "render[s] an advisory sentence to the court" and the trial court, "notwithstanding the recommendation of a majority of the jury," enters the sentence. § 921.141(2)-(3), Fla. Stat. (2004); see also Combs v. State, 525 So.2d 853, 855-58 (Fla.1988) (discussing the statutory role of the jury in the sentencing process in Florida). We have also repeatedly rejected claims that the standard jury instruction impermissibly shifts the burden to the defense to prove that death is not the appropriate sentence. See, e.g., Sweet v. Moore, 822 So.2d 1269, 1274 (Fla.2002); Carroll v. State, 815 So.2d 601, 622-23 (Fla.2002); San Martin v. State, 705 So.2d 1337, 1350 (Fla.1997) (concluding that weighing provisions in Florida's death penalty statute requiring the jury to determine "[w]hether sufficient mitigating circumstances exist which outweigh the aggravating circumstances found to exist" and the standard jury instruction thereon did not unconstitutionally shift the burden to the defendant to prove why he should not be given a death sentence). We have previously concluded that the "murder in the course of a felony" aggravating circumstance is not an unconstitutional *1281 automatic aggravator, nor does instruction on the felony aggravator allow the jury to consider an automatic aggravator in recommending whether to impose the death sentence. See Griffin v. State, 866 So.2d 1, 14 (Fla.2003), cert. denied, 543 U.S. 962, 125 S.Ct. 413, 160 L.Ed.2d 328 (2004).
Therefore, Rodriguez has failed to demonstrate that trial counsel's performance was deficient and that there is a reasonable probability that the result would have been different had trial counsel objected to the jury instructions in question. See Henderson v. Singletary, 617 So.2d 313, 316 (Fla.1993). The trial court's denial of these claims was proper.

Cumulative Error
Finally, Rodriguez argues that the number and types of error that occurred cumulatively prevented Rodriguez from receiving a constitutionally adequate trial. "[W]here individual claims of error alleged are either procedurally barred or without merit, the claim of cumulative error must fail." Griffin, 866 So.2d at 22; accord Downs v. State, 740 So.2d 506, 509 n. 5 (Fla.1999). Therefore, we find no merit to Rodriguez's claim of cumulative error.

PETITION FOR WRIT OF HABEAS CORPUS
Rodriguez raises the following claims in his petition for a writ of habeas corpus: (1) appellate counsel was ineffective for failing to raise numerous issues, including improper prosecutorial argument, improper jury instructions, the unconstitutionality of Florida's death penalty statute, the improper admission of opinion testimony, the introduction of gruesome and misleading photographs, the improper exclusion of testimony regarding Tata's non-arrest, and an incomplete record on appeal; (2) this Court failed to conduct a meaningful harmless error analysis when considering the effect of improper prosecutorial argument and inadmissible hearsay testimony in the direct appeal case; and (3) the constitutionality of the first-degree murder indictment must be revisited in light of the United States Supreme Court's decisions in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), and Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).[16]

Ineffective Assistance of Appellate Counsel
In evaluating a claim of ineffective assistance of appellate counsel, this Court determines whether the alleged omissions are of "such magnitude as to constitute a serious error or substantial deficiency falling measurably outside the range of professionally acceptable performance" and "whether the deficiency in performance compromised the appellate process to such a degree as to undermine confidence in the correctness of the result." Groover v. Singletary, 656 So.2d 424, 425 (Fla.1995) (quoting Pope v. Wainwright, 496 So.2d 798, 800 (Fla.1986)). Appellate counsel is not ineffective for failing to raise issues not preserved for appeal. See Medina v. Dugger, 586 So.2d 317, *1282 318 (Fla.1991); Roberts v. State, 568 So.2d 1255, 1261 (Fla.1990). However, an exception is made where appellate counsel fails to raise a claim which, although not preserved at trial, represents fundamental error. See Kilgore v. State, 688 So.2d 895, 898 (Fla.1997). A fundamental error is error that "reach[es] down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error." State v. Delva, 575 So.2d 643, 644-45 (Fla.1991) (quoting Brown v. State, 124 So.2d 481 (Fla.1960)).

1. Prosecutorial Argument
Rodriguez asserts that appellate counsel was ineffective for failing to argue on appeal that the State made improper comments during the guilt phase closing argument.
Rodriguez acknowledges that one instance of improper prosecutorial comments was raised on direct appeal. See Rodriguez, 609 So.2d at 500-01.[17] However, his argument here is that the prosecutor's entire closing argument consisted of inflammatory and improper comments, which appellate counsel should have challenged on direct appeal rather than merely challenging an isolated comment.
Rodriguez takes issue with the prosecutor's comment during the closing argument of the penalty phase that it would be the "easy way out" if the jury voted for a life sentence. Specifically, the prosecutor stated:
You all individually took your oaths to follow the law and render a verdict that is in accordance with the law and the evidence. Just because now you have the chance to individually vote doesn't mean that you should take the easy way out, and vote for something that isn't legal. Because I am going to tell you, that the safe thing to do is to go back in there and vote for life. It's the easy thing to do. . . . And in this case, it would not be the legal thing to do.
The prosecutor made this comment while explaining to the jury the purpose of aggravating and mitigating factors. Even assuming the comment was improper, it was harmless given the aggravating circumstances (prior conviction of violent felony; murder was committed during a robbery and for financial gain; and the murder was HAC) and the small amount of mitigating circumstances presented (defendant's good marriage and family life). In light of the evidence presented, it is unlikely that this comment contributed to the jury's recommendation of the death penalty. See Hitchcock v. State, 755 So.2d 638, 643 (Fla.2000) ("Any error in prosecutorial comments is harmless if there is no reasonable probability that those comments affected the verdict."). As Rodriguez has failed to show how appellate counsel's failure to raise this claim undermined the fairness of the appellate process, this claim is denied.
Rodriguez also takes issue with the prosecutor's request that the jury "[a]s members of this community ... give to the Court, a recommendation of the community *1283 based on the facts of the case as to what the appropriate penalty should be." While trial counsel preserved the issue for appellate review by making a contemporaneous objection to the comment, the comment is not erroneous because the prosecutor was simply advising the jury to follow the law. See Fla. Std. Jury Instr. (Crim.) 2.09 (admonishing the jury to follow the law spelled out in the instructions). Thus, even if appellate counsel had raised this issue on appeal, he would not have prevailed. Appellate counsel cannot be deemed ineffective for failing to pursue a meritless claim. See Johnson v. Singletary, 695 So.2d 263, 266-67 (Fla.1996).
Next, Rodriguez argues that a comment made by the prosecutor before discussing the aggravating and mitigating circumstances in the case was improper. The prosecutor stated that "[i]ts an unfortunate comment on the community that we live in today that first degree murders happen all too [often]. Murders happen much, much too often." Trial counsel did not object to this comment and, therefore, it was not preserved for appeal. See Teffeteller v. Dugger, 734 So.2d 1009, 1026 (Fla. 1999). We note that Rodriguez has singled out a few sentences of the prosecutor's argument and quotes them out of context. The prosecutor's entire statement in this regard follows:
What is or are the aggravating circumstances that have been proven to you beyond any doubt and what are the arguments made to you in mitigation to excuse this murder? The answer to the two questions we talked about.
First, what type of person is the defendant and secondly, what type of first degree murder was this?
It is an unfortunate comment on the community that we live in today that first degree murders happen all too happen [sic]. Murders happen much, much too often. We read about them, we hear about them. It's not a good comment on the community in which we live in hearing the kind of things that happen. Sixteen year old kids shoot clerks during a robbery. That's a first degree murder, felony murder. That's not a death case. That's not a case in which the jury will consider the death penalty. Drug dealers are shot in the head and dumped in the Everglades. We read about that. That's first degree murder, not necessarily a death case; not a death case.
Those kinds of things [sic] that are not considered for the ultimate penalty are first degree murders. What sets this case apart from those cases? What makes this case different? What makes this murder terrible? And heinous? Well, those are the aggravating factors that we're going to talk about.
In the instant case, the prosecutor's comments were made during the penalty phase as a way of introducing the aggravating circumstances. The State did not urge the jury to vote for death as a means of sending a message to the community. See, e.g., Freeman v. State, 761 So.2d 1055, 1070 (Fla.2000). Further, it is not improper to comment to the jury on why we have the felony murder rule. See id. Thus, even if appellate counsel had raised these issues on direct appeal, they would have been found to be without merit. Appellate counsel cannot be deemed ineffective for failure to raise a meritless argument. See Johnson, 695 So.2d at 266-67.
Finally, Rodriguez argues that the prosecutor made improper comments about the prior violent felony aggravating circumstance. The prosecutor stated:
What were the facts of that separate crime, totally separate from the murder that occurred the following day on an innocent family?

*1284 Remember, an innocent family in their own home. A man was shot, terrorized, kids [sic]. Nothing is more precious to us Americans than the right to be free and safe within our own homes.
Think about what [the] plan was that the defendant helped mold at that home. Tie up, handcuff people in their own homes. Do you remember Willy Gonzalez? 10 year old kid, tied up within a home, handcuffed, terrorized?
Only the first comment was objected to and properly preserved. However, Rodriguez's claim of error as to all of these comments is meritless. The facts of a prior violent felony are admissible during the penalty phase of trial. See Rodriguez v. State, 753 So.2d 29, 44 (Fla.2000). Thus, appellate counsel cannot be deemed ineffective for failing to pursue this meritless claim. See Johnson, 695 So.2d at 266-67.

2. Jury Instructions
Rodriguez also alleges that he was denied the effective assistance of appellate counsel because counsel failed to raise claims relating to a number of the jury instructions given at trial. These claims assert that the pecuniary gain aggravating circumstance instruction given at trial was unconstitutionally overbroad and vague; the jury's sense of responsibility was unconstitutionally diluted; it was improper doubling of the aggravating circumstances to instruct the jury on both the pecuniary gain aggravator and the committed during a robbery aggravator; and the instructions improperly shifted the burden to the defendant to prove that a life sentence would be appropriate. With the exception of the doubling claim, Rodriguez raised the same claims of instructional error in his 3.850 motion. To the extent that Rodriguez is attempting to use this habeas petition as a substitute for or an additional appeal of his postconviction motion, we deny relief on these claims. See Hardwick v. Dugger, 648 So.2d 100, 105 (Fla.1994).
Rodriguez asserts that the many of the instructions given to the jury violated his constitutional rights under Espinosa v. Florida, 505 U.S. 1079, 112 S.Ct. 2926, 120 L.Ed.2d 854 (1992).[18] To raise an Espinosa error in postconviction proceedings in which the sentence and conviction are final, the defendant must allege: (1) that the issue has been preserved for appeal by either an objection at trial or by submitting an expansive jury instruction; and (2) that appellate counsel pursued the issue on direct appeal. See State v. Breedlove, 655 So.2d 74, 76 (Fla.1995); Lambrix v. Singletary, 641 So.2d 847, 848 (Fla. 1994); James v. State, 615 So.2d 668, 669 (Fla.1993). In the instant case, trial counsel failed to object to the instructions on this basis and appellate counsel did not pursue the claims on appeal. Therefore, any challenges to the substance of the jury instructions are procedurally barred in this proceeding.
Rodriguez also asserts that appellate counsel rendered ineffective assistance by failing to raise other claims of instructional error on appeal. Even assuming that the burden shifting and jury dilution claims had been properly preserved for *1285 appellate review, appellate counsel could not be deemed ineffective for failing to raise these issues on direct appeal. This Court has consistently held that the burden-shifting argument is without merit. See Demps v. Dugger, 714 So.2d 365, 368 n. 8 (Fla.1998); Johnson v. State, 660 So.2d 637, 647 (Fla.1995). We have also held that it is permissible to advise the jury that its role is advisory. See Cherry v. State, 781 So.2d 1040, 1054 (Fla.2000). Appellate counsel cannot be deemed ineffective for failing to pursue meritless issues on direct appeal. See Freeman v. State, 761 So.2d 1055, 1070-71 (Fla.2000).
Rodriguez also asserts that appellate counsel should have argued that it was improper doubling of the aggravating circumstances for the jury to be instructed on both the pecuniary gain and commission during a robbery aggravators. At trial, defense counsel objected to the State's arguing both pecuniary gain and robbery in aggravation because "they are in effect the same thing." The trial court overruled the objection, and defense counsel did not submit a limiting instruction. Even if appellate counsel had raised this issue on direct appeal, we would not have granted relief on the claim. While a trial court's finding of both the pecuniary gain and a murder during the course of a robbery aggravating factors constitutes improper doubling, it is not improper to instruct a jury on both. See Derrick v. State, 641 So.2d 378, 380 (Fla.1994). Moreover, the court is not required to give a limiting instruction as to the doubling of aggravating factors unless one is specifically requested by the defendant. Id. Trial counsel never requested a limiting instruction, and the trial court considered these factors as one aggravating circumstance. Thus, this claim would have been meritless, and appellate counsel cannot be deemed ineffective for failing to pursue a meritless issue on direct appeal. Freeman, 761 So.2d at 1070-71.

3. Constitutionality of the Death Penalty
Rodriguez claims that appellate counsel was ineffective in his challenge of the constitutionality of the death penalty on direct appeal. See Rodriguez, 609 So.2d at 500. Appellate counsel cannot be deemed ineffective for failing to prevail on a claim raised and rejected on appeal. See Spencer v. State, 842 So.2d 52, 74 (Fla.2003). Further, to the extent that Rodriguez is attempting to circumvent the prohibition against using postconviction proceedings as a means of obtaining a second appeal of issues raised on direct appeal, the claim is procedurally barred. See Turner v. Dugger, 614 So.2d 1075, 1078 (Fla.1992). Finally, this Court has rejected similar claims regarding the constitutionality of Florida's death penalty. See Provenzano v. State, 761 So.2d 1097, 1099 (Fla.2000) (holding execution by lethal injection does not constitute cruel punishment or unusual punishment or both); Provenzano v. Moore, 744 So.2d 413, 416 (Fla.1999) (holding execution by electrocution in Florida's electric chair does not constitute cruel or unusual punishment). Rodriguez is not entitled to relief on this issue.

4. Witness Opinion Testimony
Rodriguez also takes issue with paramedic Dante Perfumo's penalty phase testimony regarding his experience and the amount of suffering the victim endured. Perfumo, who had been a firefighter for ten years and worked rescue for over three years, testified that he responded to the scene and found the victim alive and conscious. Perfumo also related that the victim was conscious, talking, and in extreme pain during the trip to the hospital. When the State asked Perfumo if he truly believed the victim would survive his *1286 injuries as Perfumo had repeatedly assured the victim during the trip to the hospital, defense counsel objected on the grounds that Perfumo was not a medical doctor and was not qualified to give a medical opinion. The trial court overruled this objection and appellate counsel did not raise the issue on direct appeal.
Rodriguez now asserts that the trial court improperly admitted "gratuitous opinions" by Perfumo as to the victim's pain and suffering and that appellate counsel was ineffective for not raising the issue on appeal. However, the record shows that the only objection raised at trial related to Perfumo's opinion as to the victim's chances of survival. There was no objection to the testimony about the victim's pain. In fact, on cross-examination, defense counsel continued to question Perfumo about the pain that a gunshot wound anywhere to the body would cause. Thus, any claim regarding these specific comments was not preserved for appellate review. See Steinhorst v. State, 412 So.2d 332, 338 (Fla.1982) ("[I]n order for an argument to be cognizable on appeal, it must be the specific contention asserted as legal ground for the objection, exception, or motion below."). Appellate counsel cannot be deemed ineffective for failing to raise an issue that is not preserved for appeal. See Medina v. Dugger, 586 So.2d 317, 318 (Fla. 1991).

5. Admission of Photographs
Rodriguez contends appellate counsel was ineffective for failing to claim that the admission of gruesome and inflammatory photographs at trial resulted in prejudicial error. The admission of photographic evidence of a murder victim is within the discretion of the trial court, and its ruling will not be disturbed on appeal absent a clear showing of abuse of that discretion. See Gudinas v. State, 693 So.2d 953, 963 (Fla.1997). "While a trial court should exercise caution in admitting particularly gruesome photographs, and in limiting their numbers, such photographs may still be relevant." Larkins v. State, 655 So.2d 95, 98 (Fla.1995). The test for admissibility of such photographs is relevancy rather than necessity. See Pope v. State, 679 So.2d 710, 713 (Fla.1996).
Here, Rodriguez takes issue with various photographs of the crime scene and the autopsy. However, as the State points out, trial counsel only objected to the admission of one autopsy photograph as "inflammatory" and "morbid." Trial counsel did not object to the admission of the other autopsy photographs or the crime scene photographs. In order to preserve an issue regarding the admissibility of evidence, a defendant must make a contemporaneous objection when the evidence is admitted. See Pagan v. State, 830 So.2d 792, 811 (Fla.2002) (finding that any error in admitting photographs of child victim had not been preserved for review because counsel did not object to the photographs), cert. denied, 539 U.S. 919, 123 S.Ct. 2278, 156 L.Ed.2d 137 (2003).
As to the admission of the one autopsy photograph which was preserved for appellate review, appellate counsel's failure to raise this issue was not ineffective assistance. The photograph in question was used to establish the legal identity of the victim and was properly admitted over objection.

6. Limitation of Cross-examination Questioning
Rodriguez argues the State improperly painted the picture that he was the mastermind of the crime and that he was unable to rebut this perception because trial counsel was not allowed to question Detective Frank Castillo regarding Carlos "Tata" Sponsa, who allegedly was a principal in the crimes. Rodriguez *1287 also argues that appellate counsel was ineffective for failing to raise this claim on direct appeal.
At trial, the State explained that it intended to call Detective Castillo as a witness several times during the trial. Initially, the State explained, it would limit questioning to prior consistent statements made by coparticipant and key State witness Ramon Fernandez before he was offered a plea deal by the State. During this questioning, Detective Castillo also testified that Fernandez named the defendant Rodriguez and Tata as conspirators and participants in the robbery and murder. During cross-examination, trial counsel attempted to ask Detective Castillo whether Tata had been arrested. The State objected to the line of questioning, arguing that is was beyond the scope of the direct examination, and the trial judge sustained the objection.
While the trial court may have erred by not allowing defense counsel to pursue this line of questioning during the detective's initial testimony, any error in this regard was harmless beyond a reasonable doubt. See State v. DiGuilio, 491 So.2d 1129 (Fla. 1986). Later in the State's case, Detective Castillo was recalled by the State and testified that Tata had not been arrested despite a search for him by law enforcement and an outstanding probation violation warrant. On cross-examination, defense counsel was able to elicit that there was no warrant for the arrest of Tata for the murder of Saladrigas, despite Tata's involvement as a principal in the crime. Further, Detective Castillo could offer no explanation why a warrant had not been issued for Tata. During closing argument, defense counsel pointed out Tata's alleged role in the murder, the lack of an arrest warrant against him, and his absence from the proceedings. Because Rodriguez would not have prevailed on this claim on direct appeal, appellate counsel cannot be deemed ineffective for failing to raise the claim. Freeman, 761 So.2d at 1070-71.

7. Record on Direct Appeal
Rodriguez argues appellate counsel was ineffective for failing to ensure that the record on direct appeal was complete. This same claim was raised in Rodriguez's appeal of his 3.850 motion, albeit claiming ineffective assistance of trial counsel in this regard. Rodriguez has not sufficiently pled this claim as he has not explained what issues he was unable to raise as a result of any missing or inaccurate record. Thus, Rodriguez is not entitled to relief on this claim.

Harmless Error Analysis on Direct Appeal
Rodriguez next argues that the Court failed to conduct a meaningful harmless error analysis when it considered the effect of improper prosecutorial argument and inadmissible hearsay testimony in its direct appeal review. This claim is procedurally barred. See Bottoson v. State, 813 So.2d 31, 35 (Fla.2002) ("This Court has consistently held that habeas claims wherein the defendant challenges this Court's previous standard of review in the case are procedurally barred."); see also Thompson v. State, 759 So.2d 650, 657 n. 6 (Fla.2000) (stating that defendant's claim that this Court conducted improper harmless error analysis during direct appeal was improper "invitation to utilize the writ of habeas as a vehicle for the reargument of issues which have been raised and ruled on by this Court"). In addition, we note that Rodriguez questioned this Court's harmless error analysis in his motion for rehearing of his direct appeal, which the Court unanimously denied. Rodriguez is not entitled to relief on this claim.

Ring and Apprendi
Finally, Rodriguez contends the constitutionality of his first-degree murder *1288 sentence must be revisited in light of the United States Supreme Court's decisions in Ring and Apprendi. Specifically, Rodriguez argues that the State should have been required to allege the aggravating circumstances in the indictment and the jury should have been required to state what aggravating circumstances it found applicable.
The United States Supreme Court's recent decision in Schriro v. Summerlin, 542 U.S. 348, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004), held that the decision in Ring is not retroactive. A majority of this Court has also concluded that Ring does not apply retroactively in Florida to cases that are final, under the test of Witt v. State, 387 So.2d 922 (Fla.1980). See Johnson v. State, 904 So.2d 400, 405-07 (Fla. 2005). We have similarly concluded that Apprendi is not retroactive in application. See Hughes v. State, 901 So.2d 837, 842-43, (Fla. Apr. 28, 2005). Accordingly, Rodriguez's Ring and Apprendi claims are procedurally barred in these postconviction proceedings.
However, even if the claims were not barred, they are without merit. Two of the aggravating circumstances found by the trial court were a prior violent felony conviction (based on the contemporaneous convictions of attempted first-degree murder, attempted armed robbery, attempted armed burglary, and aggravated assault related to the home invasion) and the murder was committed during the course of a robbery. In both instances, a unanimous jury found Rodriguez guilty beyond a reasonable doubt of the offenses, thereby satisfying the mandates of the United States and Florida Constitutions. See Kimbrough v. State, 886 So.2d 965, 984 (Fla. 2004); Doorbal v. State, 837 So.2d 940, 963 (Fla.), cert. denied, 539 U.S. 962, 123 S.Ct. 2647, 156 L.Ed.2d 663 (2003).

CONCLUSION
In summary, we find no merit to Rodriguez's rule 3.850 claims, affirm the trial court's denial of the motion, and deny his petition for writ of habeas corpus.
It is so ordered.
PARIENTE, C.J., and WELLS, ANSTEAD, CANTERO, and BELL, JJ., concur.
QUINCE, J., concurs in part and dissents in part with an opinion, in which LEWIS, J., concurs.
QUINCE, J., concurring in part and dissenting in part.
I agree with the majority's decision to deny habeas relief. I also agree with the majority's determinations that the defendant did not demonstrate that the prosecutor drafted the sentencing and that the defendant's mental retardation issue can be raised in a motion filed pursuant to Florida Rule of Criminal Procedure 3.203. However, I dissent from the majority's determination to affirm the trial court's denial of 3.850 relief. I would remand this case to the trial court for a new postconviction evidentiary hearing before a different trial judge.
Rodriguez argues that the trial judge erred in denying his motion for recusal after the trial judge became a witness on the issue of the disappearance of certain documents after they were given to the trial judge by the prosecutor. The defendant filed a motion to compel production of public records, including alleged public records from the prosecutor. The prosecutor argued that certain documents were exempt from public records disclosure. The documents at issue were provided to the trial judge for an in-camera inspection. After the trial judge viewed the documents in camera and made a ruling that the *1289 documents were not subject to disclosure to the defendant, the prosecutor called the judge's office for return of the documents but they could not be located. At a hearing on this issue held prior to the evidentiary hearing on the merits of the 3.850 issues, the trial judge, because he was the last person to have possession of the missing documents, was called as a witness to testify concerning what had happened to the documents. After testifying and making a ruling on the matter, the same trial judge proceeded to conduct an evidentiary hearing in the case. The defendant filed a written motion to disqualify the trial judge from presiding over the rest of the hearings based on his participation as a witness on the public records issue and based on his conversations with subpoenaed witnesses.[19]
Thus, the question is whether the trial judge's participation as a witness in the proceeding concerning the whereabouts of documents claimed to be exempt from public records disclosure precluded him from presiding over the evidentiary hearing on Rodriguez's substantive claims, including a claim concerning the same documents that the judge had provided testimony about.
Rodriguez asserts that Judge Thomas Carney should have disqualified himself from presiding over the postconviction proceedings on the basis of judicial bias at trial and alleged ex parte communications during the postconviction proceedings. Over the course of these lengthy postconviction proceedings, Rodriguez made many motions to disqualify Judge Carney from the postconviction proceedings. At the outset I note that any claim of judicial bias during trial should have been raised on direct appeal and is procedurally barred in this postconviction proceeding. See Smith v. State, 445 So.2d 323, 325 (Fla.1983) ("Issues which either were or could have been litigated at trial and upon direct appeal are not cognizable through collateral attack.").[20]
Rodriguez also asserts that Judge Carney engaged in several ex parte communications during the postconviction proceedings which should have resulted in the judge's disqualification. While most of these motions were properly denied as untimely or legally insufficient, I believe there are serious problems with the denial of the motion filed in December 1996 concerning the alleged public records received by the trial judge from the prosecutor.
Rodriguez filed a motion to disqualify the judge based on the proceedings that transpired during a hearing on Rodriguez's motion to compel public records, held ten days earlier. During the hearing, the parties discussed documents given to the judge for an in-camera inspection in September 1995 and subsequently lost. The state attorney testified that she removed certain documents from the state attorney's file that she believed to be exempt from the public records law and provided them to the court for an in-camera inspection, but neglected to make copies of the documents. Several days later, the *1290 judge issued a ruling that the documents were not public records and thus not subject to disclosure. Some months later, the state attorney realized that she had not received the original documents back and contacted the clerk of the court to determine if the originals had been included in the court file. When the clerk could not locate the documents, the state attorney contacted the judge's judicial assistant to determine if the missing documents were still in the judge's chambers. In July 1996, ten months after the in-camera inspection, the state attorney sent a letter to the judge, with a copy to Rodriguez's postconviction counsel, advising of the unsuccessful attempt to locate the missing documents and the need to discuss the matter at the next status hearing or during the hearing on the motion to compel. The state attorney testified that she never spoke directly to the judge about the status of the documents.
Because the judge was the last person to have possession of these documents, Rodriguez called the judge to testify about the documents and their status. Postconviction counsel orally moved for the judge's disqualification based upon his participation as a witness in the proceedings. The motion was denied. The judge testified that the state attorney gave him the documents in a manila envelope; during an in-camera inspection, he concluded that the documents were not public records; and he returned the documents to the manila envelope. From that point on, the judge did not know what happened to the envelope and could not locate it after an exhaustive search of his office. After this hearing, Rodriguez filed a written motion to disqualify the judge based on his participation as a witness at the evidentiary hearing.
The need to have a judge testify is limited in scope and particularly applies to factual matters that are outside the record. See Rivera v. State, 717 So.2d 477, 482 (Fla.1998); State v. Lewis, 656 So.2d 1248, 1250 (Fla.1994). The judge's testimony here met these requirements  the disposition of the missing documents was a factual matter outside the record and the judge had special knowledge about the matter.
In considering a motion to disqualify, a court is limited to determining the legal sufficiency of the motion itself and may not pass on the truth of the facts alleged. Fla. R. Jud. Admin. 2.160(f); see also MacKenzie v. Super Kids Bargain Store, Inc., 565 So.2d 1332, 1339 (Fla.1990). The motion to disqualify must show either a well-grounded fear on the part of the movant that he will not receive a fair hearing based on a "specifically described prejudice or bias of the judge" or show that the judge is either an interested party to the matter, related to an interested party, related to the counsel, or "is a material witness for or against one of the parties to the cause." Fla. R. Jud. Admin. 2.160(d) (emphasis added).
It was error for Judge Carney to deny Rodriguez's motion to disqualify and to become both witness and presiding judge at this hearing. As we stated in Rose v. State, 601 So.2d 1181 (Fla.1992),
[t]his Court is committed to the doctrine that every litigant is entitled to nothing less than the cold neutrality of an impartial judge. . . . The exercise of any other policy tends to discredit the judiciary and shadow the administration of justice.
. . . The attitude of the judge and the atmosphere of the court room should indeed be such that no matter what charge is lodged against a litigant or what cause he is called on to litigate, he can approach the bar with every assurance that he is in a forum where the judicial ermine is everything that it typifies, *1291 purity and justice. The guaranty of a fair and impartial trial can mean nothing less than this.
Id. at 1183 (quoting State ex rel. Davis v. Parks, 141 Fla. 516, 194 So. 613, 615 (1939)). The judge's actions during these postconviction proceedings offend the notion of a fair and impartial proceeding. The judge testified as a witness in the public records hearing and then went on to rule upon his own credibility when he denied relief on Rodriguez's public records claim. The judge also presided over the subsequent 3.850 evidentiary hearing and entered an order denying all relief thereafter. I conclude that Rodriguez is entitled to a new postconviction proceeding before a new trial judge. See Suarez v. Dugger, 527 So.2d 190, 191 (Fla.1988) (vacating judge's denial of 3.850 motion, remanding for new postconviction proceeding, and directing another judge within circuit be assigned to preside over proceedings where judge erroneously denied legally sufficient motion to disqualify); see also Fuster-Escalona v. Wisotsky, 781 So.2d 1063, 1065 (Fla.2000) ("When a trial court fails to act in accord with the statute and procedural rule on a motion to disqualify, an appellate court will vacate a trial court judgment that flows from that error.").
In discussing judicial disqualification and the importance of judicial neutrality, this Court has spoken in unequivocal language:
Under no circumstances may a judge sit in the trial of an action when his or her neutrality is shadowed or questioned. The truth-seeking function of a court proceeding is undermined when there remains an open question as to a judge harboring a prejudice against a litigant. Logically, any decision by a judge under a cloud of prejudice would be suspect, thus undermining the integrity of the court proceeding and any movement toward judgment.
Fuster-Escalona, 781 So.2d at 1065-66 (citations omitted); see also Livingston v. State, 441 So.2d 1083, 1085 (Fla.1983) (reversing defendant's conviction and death sentence where trial judge denied legally sufficient motion to disqualify).
I cannot agree with the majority that the trial judge was not a material witness regarding Rodriguez's public records claim. Whether or not documents are subject to disclosure under the public records act and whether those documents contain information that could be favorable to the defense are substantive matters that are litigated in numerous death penalty postconviction proceedings. In fact, one of the issues raised in this postconviction appeal concerns the very documents that were the subject of the trial judge's testimony. Thus, Judge Carney's testimony did go "to some fact affecting the merits of the cause and about which no other witness might testify." Wingate v. Mach, 117 Fla. 104, 157 So. 421, 422 (1934).
Under these circumstances, I believe the trial judge should have recused himself and should not have conducted the evidentiary hearing or ruled on the nonevidentiary issues in Rodriguez's postconviction motion. Therefore, I would vacate the trial court's order denying postconviction relief and remand this case for a new evidentiary hearing and determination before a different trial judge.
LEWIS, J., concurs.
NOTES
[1] Rodriguez claimed that the trial court erred by proceeding without the presence of a defense witness and by refusing to permit introduction of the witness's prior deposition testimony; it was fundamental error to conduct a joint trial for the first-degree murder charge and the charges stemming from the attempted home invasion; it was error to admit the identification testimony by the victim's sister-in-law; inadmissible hearsay was introduced to improperly bolster the testimony of State witnesses; the death penalty is disproportionate in his case; the prosecutor made improper comments on Rodriguez's demeanor off the stand; the murder was not HAC; the sentencing order was deficient and reflected that the trial court did not consider certain mitigating factors; the trial court improperly considered the impassioned pleas of family members; and Florida's death penalty statute is unconstitutional. Rodriguez, 609 So.2d at 497, 500.
[2] Huff v. State, 622 So.2d 982 (Fla.1993).
[3] The thirty claims raised in Rodriguez's 192-page motion alleged: (1) certain public files and records pertaining to his case were withheld in violation of chapter 119, Florida Statutes (1997); (2) the State withheld exculpatory evidence; (3) counsel failed to obtain an adequate mental health evaluation and failed to provide the necessary background information to the mental health consultants as required under Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985); (4) counsel rendered ineffective assistance at the guilt phase in failing to prepare an adequate defense, to request a severance of the offenses, to object to the admission of identification testimony, and other deficient performance; (5) counsel was ineffective in failing to discover and remove biased jurors during voir dire; (6) Rodriguez was denied adversarial testing when exculpatory evidence was withheld; (7) Rodriguez is innocent of first-degree murder; (8) counsel rendered ineffective assistance at both the guilt and sentencing phases in failing to investigate mitigating evidence; (9) the aggravating circumstances set forth in the death penalty statute are unconstitutionally vague and overbroad; (10) the jury instruction on the violent felony aggravating circumstance was vague and overbroad; (11) the jury instruction on the pecuniary gain aggravating circumstance was vague and overbroad; (12) the jury instruction on the committed during the course of a robbery aggravating circumstance was vague and overbroad; (13) the jury was improperly instructed on the HAC aggravating circumstance; (14) the jury was improperly instructed that one single act supported two separate aggravating circumstances; (15) comments by the court and the prosecutor as to the jury's advisory role diluted the jury's sense of responsibility for sentencing in violation of Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985); (16) the penalty phase jury instructions improperly shifted the burden to Rodriguez to prove that the death penalty was inappropriate; (17) the use of the underlying robbery to support the felony aggravating circumstance is an unconstitutional automatic aggravating circumstance; (18) the sentencing judge failed to find mitigating circumstances established by the evidence in the record; (19) newly discovered evidence establishes that Tata planned the crimes and was the leader of the group, not Rodriguez; (20) the prosecutor introduced nonstatutory aggravating factors which the sentencing court relied upon in imposing the death penalty; (21) counsel rendered ineffective assistance in failing to object to the prosecutor's improper conduct and argument; (22) Florida's capital sentencing statute is unconstitutional on its face and as applied; (23) the prosecutor impermissibly suggested that the law required the jury to recommend a sentence of death; (24) Rodriguez was denied a proper direct appeal due to omissions in the record; (25) Rule Regulating the Florida Bar 4-3.5(d)(4) prohibits Rodriguez from interviewing jurors regarding juror misconduct; (26) juror misconduct occurred in both the guilt and penalty phases of the trial; (27) cumulative error requires a new trial; (28) judicial bias, including that the judge permitted the State to prepare the sentencing order, requires a new trial; (29) Rodriguez was incapable of making a knowing, intelligent waiver of any constitutional rights due to his mental retardation; and (30) newly discovered evidence establishes that execution by electrocution is cruel and unusual punishment.
[4] Florida Rule of Criminal Procedure 3.203, which became effective on October 1, 2004, "applies in all first-degree murder cases in which the state attorney has not waived the death penalty on the record and the defendant's mental retardation becomes an issue." Fla. R.Crim. P. 3.203(a). The rule specifies the time for filing a motion for determination of mental retardation as a bar to execution. In circumstances such as Rodriguez's, i.e., if the death-sentenced prisoner has filed a motion for postconviction relief that has been ruled on by the trial court and an appeal is pending on or before the effective date of the rule, the prisoner may file a motion to relinquish jurisdiction for determination of mental retardation. Fla. R.Crim. P. 3.203(d)(4)(E).
[5] Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).
[6] Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985).
[7] Rodriguez's claims concerning prosecutorial misconduct, the constitutionality of the death penalty, and victim impact evidence are procedurally barred because they were raised and rejected on direct appeal. See Rodriguez, 609 So.2d at 500-01; Turner v. Dugger, 614 So.2d 1075, 1078 (Fla.1992) (stating that postconviction proceedings cannot be used as means to obtain second appeal of issues raised on direct appeal). In addition, the arguments involving an incomplete appellate record and the Rule Regulating the Florida Bar 4-3.5(d)(4) prohibition on communication with jurors are procedurally barred because they should have been, but were not, raised on direct appeal. See Smith v. State, 445 So.2d 323, 325 (Fla.1983) ("Issues which either were or could have been litigated at trial and upon direct appeal are not cognizable through collateral attack."). We need not address these claims any further. Moreover, we will not consider such procedurally barred claims under the guise of ineffective assistance of counsel. See Freeman v. State, 761 So.2d 1055, 1067 (Fla.2000) (holding that claims that could have been raised on direct appeal cannot be relitigated under the guise of ineffective assistance of counsel).
[8] According to the Diagnostic and Statistical Manual of Mental Disorders, mental retardation is "characterized by significantly subaverage intellectual functioning (an IQ of approximately 70 or below) with onset before age 18 years and concurrent deficits or impairments in adaptive functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 39 (4th ed. 2000). Even where an individual's IQ is lower than 70, mental retardation would not be diagnosed if there are no significant deficits or impairments in adaptive functioning. Id. at 42. Adaptive functioning refers to "how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting." Id. In order for mental retardation to be diagnosed, there must be significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety. Id. at 41.
[9] Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).
[10] For example, the record contains three volumes of medical records from the Department of Corrections, two volumes of records from the state prison system, and one volume from the federal prison system.
[11] For example, in a May 1997 request to the Florida Department of Law Enforcement, Rodriguez requested "any and all records (regardless of form and including photographs, sound or video records, physical evidence, and electronic mail and/or file) related to any cases in which Gilberto Arango Bustamante was a defendant, witness, suspect and/or victim." The request contained sixteen paragraphs describing the records sought. These included an exhaustive list of any kind of records associated with the named individual. However, the records sought also included the complete personnel files of all personnel who may have investigated matters relating to the named individual, all travel records and logs of personnel or other individuals involved in any way in any matter investigated relating to the named individual, all visitation records for any individual associated in any way whatsoever to any matter being investigated relating to the named individual, copies of all departmental policies governing maintenance and destruction of records and physical evidence, and a complete organizational chart of the agency. Rodriguez made similar requests regarding six other individuals to the Florida Department of Law Enforcement and the Department of Corrections in May 1997. In fact, the record contains forty-five separate public records requests made by Rodriguez in May 1997.
[12] Section 48.031(4)(a)(3), Florida Statutes (1995), provides in pertinent part that a person designated to accept service of a criminal witness subpoena for a government employee or a law enforcement officer is not required to accept service "[i]f the appearance date is less than 5 days from the date of service."
[13] Judge Carney testified that the missing documents were given to him in a manila envelope that was approximately one-half inch thick, included more than ten pages, and were handwritten on legal pad paper.
[14] After he examined the documents, Judge Carney placed them back in the manila envelope and thought that he directed them to the clerk's office. However, he could not recall with certainty what he did with the documents after placing them back in the envelope.
[15] Judge Carney testified that he searched his office from "top to bottom" for two hours trying to locate the documents, but to no avail.
[16] Many of the issues raised in claim 1 are repetitive of the issues raised in Rodriguez's 3.850 postconviction appeal, including the claims of erroneous jury instructions and the unconstitutionality of Florida's death penalty statute. Although Rodriguez has couched these claims in terms of ineffective assistance of appellate counsel, he cannot overcome a procedural default by recasting the argument in the guise of an ineffective assistance claim. See Freeman v. State, 761 So.2d 1055, 1067 (Fla.2000). Additionally, habeas corpus petitions are not to be used for additional appeals on questions which could have been or were raised on appeal or in a rule 3.850 motion. See Hardwick v. Dugger, 648 So.2d 100, 105 (Fla.1994).
[17] On direct appeal, appellate counsel argued that the prosecutor's comments on Rodriguez's demeanor off the witness stand rendered the sentencing proceedings unfair. During closing argument, the prosecutor stated that Rodriguez had his eyes closed and was sleeping. Trial counsel objected and noted that Rodriguez was listening to the interpreter rather than sleeping. Rodriguez, 609 So.2d at 500-01. This Court concluded that the comment was improper, but did not warrant reversal as defense counsel failed to request a curative instruction and the misconduct was not so egregious as to taint the validity of the jury's recommendation. Id. at 501.
[18] In Espinosa, the United States Supreme Court held that where the sentencer (i.e., the judge or the jury) weighs an invalid aggravating circumstance, the defendant's sentence must be reversed. The Court found "that an aggravating circumstance is invalid in this sense if its description is so vague as to leave the sentencer without sufficient guidance for determining the presence or absence of the factor." Espinosa v. Florida, 505 U.S. 1079, 1081, 112 S.Ct. 2926, 120 L.Ed.2d 854 (1992). This Court has noted that the rule announced in Espinosa did not constitute a change in the law requiring retroactive application. See Marek v. Singletary, 626 So.2d 160, 162 (Fla.1993).
[19] It should be noted that the defendant was also concerned with the fact that the trial judge had excused from attendance at the hearing, without notice to the defendant, several records custodians who had been subpoenaed by the defendant. However, the subpoenas were issued only one day before the scheduled hearing and the custodians were not given sufficient time to file motions for protective orders, etc.
[20] Rodriguez claims the trial judge was biased based on alleged comments calling defense counsel "ridiculous" and "childish," comments the defendant says were designed to belittle defense counsel. Rodriguez also claims bias based on the trial judge referring to him as a "rare, despicable person."